IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**KELLY E. BURTON,**                                        Case 3:14 CV 2614

      Plaintiff,                                        Judge James G. Carr

      v.                                        Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                        REPORT AND RECOMENDATION

### INTRODUCTION

Plaintiff Kelly Burton ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b). (Non-document entry dated December 1, 2014). For the reasons stated below, the undersigned recommends affirming the Commissioner's decision to deny benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI on September 9, 2011, alleging an onset date of August 7, 2011. (Tr. 358-71). Plaintiff applied for benefits due to a back injury, bone spurs, pinched nerves, a learning disability, and depression. (Tr. 390). Her claims were denied initially and upon reconsideration. (Tr. 272-78, 282-95). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 296). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on December 3, 2012, after which the ALJ found Plaintiff not disabled. (Tr. 158-215). The Appeals Council denied Plaintiff's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981.  Plaintiff filed the instant action on November 30, 2014. (Doc. 1).

## FACTUAL BACKGROUND

### Personal Background and Testimony

Born August 22, 1978, Plaintiff was 34 years old as of the hearing date. (Tr. 190). She was single, with no children, and lived with her parents. (Tr. 190-91). She had a driver's license, testified she drove about three times a week, and had no limitations on her driving. (Tr. 191, 397). Plaintiff completed the twelfth grade but was in special education courses. (Tr. 192, 397, 467-90). She stated she can read and write some but she cannot spell well and has to "skip over some words" when reading. (Tr. 192, 397). However, she can read a newspaper or a grocery list. (Tr. 192-93).

Plaintiff had past work as a dietary aide in 2011 but claims she was let go due to her back problems. (Tr. 194). During the day, she helped around the house by doing dishes, dusting, cleaning the bathroom, and laundry but could not do these on a consistent basis. (Tr. 195, 198). To perform tasks she stated she often had to take multiple breaks of about fifteen minutes before she could continue. (Tr. 198, 397). Plaintiff had no problems with personal hygiene or grooming and was capable of tasks such as grocery shopping. (Tr. 195, 397). On a good day—of which there are two to three a week— she can go out, visit with friends, get on the computer, and watch TV. (Tr. 196). However, on a bad day she spends her day laying down for about two to three hours at a time. (Tr. 198).

She testified her pain was concentrated in her lower back and then radiated into her hips and legs. (Tr. 197). She also stated she had neck problems and fibromyalgia. (Tr. 197). This pain caused difficulty with lifting, squatting, walking, climbing, bending, kneeling, and standing. (Tr.

420). To reduce her pain she sat in a recliner or laid down. (Tr. 197). Although she was on multiple medications, Plaintiff testified that they did not completely remove her pain. (Tr. 199). She also reported having to use a back brace at all times when she was standing or walking. (Tr. 421).

She said even on good days her pain was a five or six on a ten point scale; and on bad days rose to an eight or nine. (Tr. 199). Plaintiff also reported back spasms and spinal pain characterized as a "burning, cold sensation." (Tr. 200). She stated she often needed to lie down to relieve the pressure in her back and had difficulty sleeping because of the pain. (Tr. 201). And while Plaintiff also had a diagnosis of depression, she had only just begun receiving treatment a month before the hearing. (Tr. 204).

### Relevant Medical Evidence[1]

An October 2001 MRI showed discs with well-preserved heights, no abnormalities in the cervical cord, yet minimal bulging and deterioration in some discs. (Tr. 523). It also revealed mild bilateral spondylolysis and compromised L5 nerve roots. (Tr. 524). An electromyography completed at the same time displayed no evidence of cervical, dorsal, or lumbar radiculopathy. (Tr. 527). An x-ray in 2004 of the lumbar spine showed an increase in the spondylolysis of the L5/S1 disc. (Tr. 638). Plaintiff underwent another MRI in February 2011 which revealed mild bilateral spondylolysis at L5/S1 and moderate narrowing of disc space of L5/S1. (Tr. 611). There was also mild narrowing of the disc spaces at T11/T12. (Tr. 611).

On August 9, 2011, Plaintiff saw Kellee Gooden, M.D., for a third interlaminar epidural steroid injection. (Tr. 684). She complained the pain was a ten out of ten on the pain scale. (Tr. 684). This was an increase from previous visits where she reported pain between two and four

---

1. This summarization of medical evidence contains certain objective findings from prior to the alleged onset date; they are included for reasons of comparison.

out of ten. (Tr. 688, 692). Following the injection, Plaintiff left against medical advice "because she was upset that [Dr. Gooden] would not give her any additional refills on her pain medications." (Tr. 686). Plaintiff did not return to Dr. Gooden for any further pain management.

A few days later Plaintiff saw her primary care physician Anna McMaster, M.D., for a regular check-up. (Tr. 665). At this appointment, Plaintiff complained of regular crying but admitted she was off Cymbalta because she could no longer afford it. (Tr. 665). On examination, she observed Plaintiff moved slowly and cautiously, had paraspinal and midline tenderness, and positive straight leg raise test on the right. (Tr. 665). Dr. McMaster suggested following up on surgical consult or trying another pain management specialist. (Tr. 666).

In November 2011, Lawrence Spetka, M.D., saw Plaintiff for complaints of back pain radiating into both legs. (Tr. 613). He noted good strength and a positive straight leg raise test on the left. (Tr. 613). Plaintiff indicated she would like surgery to repair the spondylolysis at L5/S1. (Tr. 613). Prior to the alleged onset date, Dr. Spetka had recommended a treatment course of epidural injections and physical therapy. (Tr. 696).

A month later, Plaintiff reported to Dr. McMaster her mood was "ok" but wanted to switch back to Cymbalta because she "felt much better on [it]." (Tr. 704). She also reported no panic attacks or sleep disturbances. (Tr. 704). On examination, Dr. McMaster observed no acute distress. (Tr. 704).

In mid-December 2011, Plaintiff presented for an L5/S1 fusion to be performed by Dr. Spetka. (Tr. 744, 747-48). Upon discharge, she was instructed to ambulate and wear her back brace at all times when up. (Tr. 752-53). Beginning in January 2012, Plaintiff went to physical therapy where she reported her pain was a three out of ten but had spiked up to a six out of ten at times. (Tr. 768). It was observed she was in moderate discomfort but was able to ambulate

without an assistive device, albeit at significantly slowed speeds. (Tr. 768-69). Plaintiff also reported that she only had to wear her back brace when she was in the car. (Tr. 768). In early February, after nine visits the physical therapist noted Plaintiff was progressing slowly due to complaints of pain, however, she recommended Plaintiff continue therapy. (Tr. 770). Plaintiff continued to report pain in her lower back and radiating down into her legs throughout the course of her treatment; yet she also admitted to not fully complying with treatment recommendations. (Tr. 778-82, 790-800).

On March 29, 2012, Dr. Spetka reported Plaintiff was "getting along reasonably well" although she had some back pain. (Tr. 787, 837). He also noted her strength was good and "flexion and extension lumbar spine films [ ] looked fine." (Tr. 787). In May 2012, Dr. McMaster diagnosed Plaintiff with fibromyalgia due to constant complaints of muscle pain although she reported no tingling or numbness. (Tr. 814). At a follow-up with Dr. Spetka in June, Plaintiff reported having good and bad days with radiating discomfort into her legs. (Tr. 838). Dr. Spetka noted Neurontin is helping but that "she is not doing as well as I would expect…" (Tr. 838). On July 11, 2012, an MRI of Plaintiff's lumbar spine revealed vertebral heights were maintained, no disc space narrowing, and no evidence of fracture; but moderate to high-grade bilateral neural foraminal stenosis and mild degenerative changes at L4/L5. (Tr. 821).

Plaintiff switched primary care physicians in July 2012 to Carol Hicks, M.D. (Tr. 832). Her depression was well-managed on Cymbalta in August 2012 where she reported feeling good and being an eight out of ten on a wellness scale. (Tr. 830). Later in August, Dr. Spetka noted her July 2012 MRI "does not look too terribly bad" but recommended a myelogram. (Tr. 841). The myelogram looked good with no evidence of nerve root compression although she still complained of leg pain. (Tr. 842-43, 845). The myelogram revealed no evidence of protruding

discs or stenosis, and only diffuse spondylitic changes. (Tr. 857). Dr. Spetka increased her Neurontin dosage and recommended epidural steroid injections. (Tr. 842).

In January 2013, Plaintiff went to Kiran Tamirisa, M.D., with complaints of persistent back, neck, buttocks, hip, leg, and generalized pain. (Tr. 870). She reported her pain was usually a four out of ten but with activity rose to a nine out of ten. (Tr. 871). Plaintiff described the pain as aching, burning, electric shock-like, and throbbing; she also reported muscle spasms, numbness, tingling, weakness, and sensitive skin. (Tr. 870-71). On examination, Plaintiff's muscle strength, reflexes, stability, and range of motion were all normal except for her lumbar spine. (Tr. 873-74). She had pain upon flexion, extension, rotation, bending, and tenderness in her lumbar spine. (Tr. 874). Dr. Tamirisa recommended core muscle and back strengthening and weight loss to improve function and reduce pain. (Tr. 876).

A month later, Plaintiff returned to Dr. Tamirisa where her chief complaint was again lower back pain but Dr. Tamirisa noted she had not complied with home exercises or attended behavioral health therapy. (Tr. 877-78). Plaintiff's physical examination findings remained consistent with those from her previous appointment. (Tr. 880-81). Dr. Tamirisa also denied Plaintiff oral narcotics because of a positive urine test for marijuana. (Tr. 881). Dr. Tamirisa again stressed exercise, core strengthening, and weight loss but Plaintiff indicated she no longer wished to see Dr. Tamirisa. (Tr. 881).

Plaintiff continued to receive injections in 2013 to manage her pain after the ALJ hearing. (Tr. 898, 906, 930). She also continued the use of a TENS unit and prescription medication. (Tr. 906, 919-20). It was also recommended she try physical therapy and weight loss but she did not follow-up on those recommendations. (Tr. 922). A July 23, 2013, MRI of Plaintiff's lumbar

spine revealed no disc herniations or spinal stenosis but post-surgical changes at L5/S1; however, there was "little other changes from the prior study." (Tr. 948).

### Opinion Evidence

On August 17, 2011, Dr. McMaster provided an opinion regarding Plaintiff's condition where she confirmed Plaintiff had worsening back pain despite physical therapy, pain medication, and injections. (Tr. 682). She also indicated Plaintiff had depression due to her back pain. (Tr. 682). As to limitations, Dr. McMaster opined Plaintiff could stand or walk for one to two hours a day, sit for an hour without interruption for a total of three to five hours a day, lift or carry up to five pounds occasionally, and was extremely limited in her ability to push, pull, bend, and reach. (Tr. 683). Dr. McMaster explained Plaintiff "[c]urrently [is] having difficulty with own ADLs, cannot get own groceries, do own housework without assistance. Observed even difficulty in [and] out of chair in waiting room." (Tr. 683). Dr. McMaster opined Plaintiff was unemployable "until appropriate neurosurgical evaluation and treatment." (Tr. 683).

### Consultative Examination

In October 2011, Plaintiff underwent a psychological consultative evaluation with K. Roger Johnson, M.Ed. (Tr. 699). Plaintiff reported being able to drive, shop, cook, get on the computer and play games, and do some laundry; but admitted problems with bending and lifting due to her back problems. (Tr. 699-700). While Plaintiff reported feeling depressed, Mr. Johnson noted few symptoms. (Tr. 700). Her mental status examination revealed she was normally groomed, cooperative, had relevant thought pattern, normal eye contact, normal energy level, with mildly blunted affect, adequate attention, and adequate judgment. (Tr. 699-700). Mr. Johnson also administered the Wechsler Adult Intelligence Scale ("WAIS-IV") where Plaintiff

received a full-scale score of 77, which indicates sub-average cognition. (Tr. 700-01). He assigned her a Global Assessment of Functioning ("GAF") score of 70.[2] (Tr. 701).

Mr. Johnson opined Plaintiff did not have significant problems in the area of understanding, remembering, and carrying out instructions; and despite her borderline intellectual functioning could "apply[ ] her reasoning abilities in a reality-based manner useful to an employer…". (Tr. 701). As to maintaining concentration, persistence, and pace, he believed her capable of performing both simple and multi-step tasks based on her ability to track conversations, her processing speed index score, and her ability to play video games. (Tr. 701). He also found she had no limitations in responding appropriately to supervisors or co-workers and could respond appropriately to work pressures as well. (Tr. 702).

### VE Testimony and ALJ Decision

The VE found Plaintiff had past relevant work as a dietary aide which is typically performed at the medium level of work, but that the Plaintiff performed the work at a light exertion level. (Tr. 206-07).  In his first hypothetical, the ALJ called for an individual who could occasionally climb ramps or stairs but never climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, or crawl. (Tr. 208). The VE testified while that individual could not perform the dietary aide as described in the Dictionary of Occupational Titles ("DOT"), they could perform it at the lower exertion level that Plaintiff had performed it. (Tr. 208).  He also identified positions of folder, packer, and cleaner which could also be performed by such an

---

[2] The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34.

individual. (Tr. 208). Adding an additional restriction of only being able to perform one to three step tasks did not alter the VE's opinion on past or available work. (Tr. 208-09).

The ALJ then imposed the same postural and mental limitations but asked for positions in the sedentary category. The VE stated her past work would be eliminated, but she could perform the positions of order clerk, bench worker, and assembler. (Tr. 209). A further restriction of a sit/stand option again eliminated Plaintiff's past work and also the positions of folder and cleaner, but left the positions of packer and assembler. (Tr. 209-10).

In a third hypothetical, the ALJ added a limitation on frequent push and pull bilaterally with both upper and lower extremities. (Tr. 211). The VE stated such a limitation would not affect the positions identified at either the light or sedentary levels. (Tr. 211).

In July 2013, the ALJ concluded Plaintiff had the severe impairments of degenerative disc disease lumbar spine, obesity, fibromyalgia, depression with anxiety, and borderline intellectual functioning; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 163-67). The ALJ then found Plaintiff had the RFC to perform light work except that she could occasionally climb ramps or stairs, but never climb ladders, ropes, or scaffolds; and she could frequently balance, stoop, kneel, crouch, and crawl. (Tr. 167). She also retained the ability to perform one to three step tasks. (Tr. 167).

Considering the VE testimony and Plaintiff's age, work experience, and RFC, the ALJ found Plaintiff could perform her past relevant work as dietary aide. (Tr. 173).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in

the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

10

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Commissioner considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff argues the ALJ erred because (1) she did not properly evaluate the opinion of treating physician, Dr. McMaster; (2) she failed to take into consideration all the medical records and thus, the RFC determination lacked a substantial evidentiary basis; (3) her Step 5 decision was not based on substantial evidence; and (4) she failed to properly evaluate Plaintiff's pain. (Doc. 12, at 2).  The Court will address each argument in turn.

### *Treating Physician*

Plaintiff argues the ALJ failed to give good reason why Dr. McMaster's opinion should not be entitled to controlling weight. (Doc. 12, at 8-10). The Defendant argues substantial inconsistent evidence exists, including other opinions, and was particularly cited to by the ALJ and thus, sufficient reasons were given for discounting her opinion. (Doc. 16, at 14-18).

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.

11

> Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians.

*Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required

to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

The ALJ gave Dr. McMaster's opinion little weight because it was provided on a checklist form without explanation for the restrictions, the restrictions were unsupported by Dr. McMaster's records, and it was objectively unsupportable. (Tr. 171). These are good reasons for discounting the weight of a treating physician; where, as here, the physician did not provide explanations for the restrictions, the regulations instruct a reduction in weight may be appropriate. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."); *see also White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 286 (6th Cir. 2009) (conclusory statements from physicians, without support from specific documents, are a valid reason for discounting an opinion).

However even putting aside the format of her opinion, Dr. McMaster's restrictions are not supported by her own records or other evidence in the record. For example, for more than a decade Plaintiff's back condition remained stable as evidenced by minimal changes between the MRIs in 2001 and February 2011. (Tr. 168, 523-27, 611, 638). Throughout this period, Dr. McMaster treated Plaintiff conservatively with medication, injections, and recommended physical therapy in which Plaintiff did not participate. (Tr. 168, 704-39). At the time she rendered her opinion in August 2011, Plaintiff was still being treated conservatively; even the surgical consult Plaintiff attended in April 2011 resulted in a recommendation of more injections and physical therapy. (Tr. 169, 696). It is appears that when Dr. McMaster rendered her opinion, Plaintiff's back pain was intermittent and helped somewhat by injections and medication. (Tr.

168, 663-83). Furthermore, Dr. McMaster's office notes do not provide support for the extreme limitations she opined in terms of Plaintiff's ability to push/pull and reach. (Tr. 683). Thus, in reviewing the reasons given and the evidence cited by the ALJ in her opinion, the Court finds the ALJ adequately explained the weight given to Dr. McMaster's opinion.

### RFC

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. § 416.929. The RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5. If the ALJ's decision was supported by substantial evidence, this Court must affirm.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Plaintiff argues the ALJ failed to review all the available evidence in making her decision on the RFC and thus, it is not supported by substantial evidence. (Doc. 12, at 10-11).

The Plaintiff provides no citation to evidence she believes undermines the ALJ's RFC, but rather broadly states that Dr. McMaster's opinion and the entirety of the medical record show that substantial evidence do not support the ALJ's conclusion. However, it is clear that the ALJ performed an in-depth review of the medical record and evaluated the evidence. Even if contradictory evidence were cited by the Plaintiff, it would not make the ALJ's citations any less appropriate. The question on review is not whether substantial evidence could support another conclusion, but rather, whether substantial evidence supports the conclusion reached by the ALJ. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

14

Here, the ALJ noted Plaintiff's medical history from both before and after the alleged onset date, including objective tests such as MRIs, myelograms, and x-rays, and medical records from her treating physicians, surgeons, and pain management doctors. (Tr. 168-69). She consistently noted the benign findings of her objective tests and the conservative treatment undertaken before and after her surgery. (Tr. 169, 787, 837, 841-45, 857, 948). The ALJ also noted the relative infrequency of Plaintiff's medical visits and her failure to comply with treatment recommendations. (Tr. 170, 790-800, 877-78). Furthermore, the ALJ cited to the findings of the state agency reviewers in support of her RFC. (Tr. 172).

In reviewing the opinion of the ALJ, the Court finds substantial evidence supported the ALJ's RFC determination.

### Step Five

Plaintiff alleges the ALJ did not accurately convey his limitations in the hypothetical given to the VE. (Doc. 12, at 11-12). In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence for the conclusion a claimant can perform other work, the hypothetical must accurately portray a claimant's physical and mental impairments. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). However, when the ALJ finds a plaintiff capable of performing their past relevant work, the disability evaluation ends before even reaching Step Five. *See* 20 C.F.R. §§ 404. 1520(f), 416.920(f).

Here, the ALJ made two findings: (1) Plaintiff was capable of performing her past work as a dietary aide as she had previously performed it; and (2) that in the alternative, other jobs

15

existed in the economy such as folder, cleaner, and packer which she could perform. (Tr. 173-74). The Court assumes Plaintiff's argument is in reference to the alternative findings since the first precludes a Step Five determination.

Here, the ALJ formed multiple hypotheticals, each one more restrictive than the last. (Tr. 206-11). The hypotheticals appropriately accounted for the symptoms and impairments the ALJ believed credible and addressed various limitations such as push/pull, bend, sit/stand options, and different exertional levels. (Tr. 206-11). Similarly, the mental limitations were based on objective evidence like the GAF score, examination notes, and WAIS-IV scores. (Tr. 699-702).

The ALJ adequately provided for the credible and supportable mental and physical impairments in his work restrictions which were reflective of the medical records. The Court has already found the ALJ did not err in the weight given to the medical opinions and thus, the ALJ's reliance upon them in making his RFC was not in error. Because the hypothetical was based upon medical evidence in the record and the limitations the ALJ found credible, the VE's testimony is substantial evidence upon which the ALJ can rely. Although, the Step Five finding was only in the alternative, the Court finds the ALJ did not err in her formulation of hypotheticals.

### Credibility

Plaintiff's next assignment of error centers around the ALJ's alleged failure to find Plaintiff's complaints of disabling pain credible. (Doc. 12, at 12-13). Analysis of alleged disabling symptoms turns on credibility and an ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004); *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). When a claimant's statements about symptoms are not substantiated by objective medical

evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1. "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1.

The Sixth Circuit recognizes that pain alone may be disabling. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). However, an ALJ is not required to accept a claimant's own testimony regarding his pain. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529; *see also* SSR 96-7p, 1996 WL 374186. For pain or other subjective complaints to be considered disabling, there must be: 1) objective medical evidence of an underlying medical condition; or 2) objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). This standard, as Plaintiff points out, does not require "objective evidence of the pain itself." *Duncan v. Sec'y of Health & Human Servs*, 801 F.2d 847, 853 (6th Cir. 1986). In evaluating credibility of Plaintiff's complaints an ALJ considers certain factors:

> (i) [A claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [Plaintiff's] pain or other symptoms;
>
> (vi) Any measures [Plaintiff] use or ha[s] used to relieve [a claimant's] pain or other symptoms; and

(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(3).

Ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. The Court may not "try the case de novo, nor resolve conflicts in evidence . . ." *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Here, the ALJ found Plaintiff's activities of daily living were inconsistent with her reports of disabling pain. (Tr. 172-73). At multiple places in the record there are contradictions about Plaintiff's ability to socialize, perform household tasks, or drive. (*See* Tr. 195, 196, 198, 397, 417, 418, 699). There is also evidence that Plaintiff exaggerated her symptoms at times; for example she presented with a cane, which was not prescribed anywhere in the record, but it was noted the cane was not being used for weight-bearing. (Tr. 173, 768-69, 699).  Further, the ALJ noted Plaintiff's credibility suffered because she failed to comply with treatment recommendations from her doctors, such as wearing a back brace, losing weight, attending behavioral health therapy, or performing core strengthening exercises. (Tr. 173, 753, 877-82). Lastly, the conservative nature of treatment after surgery implies that her subjective complaints of pain could not be substantiated by her physicians. (Tr. 172, 665-66, 722, 787, 814-15, 838). Contrary to Plaintiff's assertion, an ALJ is not required to address every factor in determining

18

credibility; but even so, the ALJ reviewed her activities of daily living, effects of medication and treatment, and Plaintiff's compliance with treatment recommendations.

The Court is limited to determining whether the ALJ applied the appropriate standard to the credibility assessment. *Cruse*, 502 F.3d at 542. It is certainly true that Plaintiff can construe these facts in a different light; however, that does not alter the reasonableness of the ALJ's conclusions that Plaintiff's activities of daily living, treatment efforts, and medical evidence do not wholly support her credibility. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). From a review of the opinion and the record, the ALJ had substantial evidence to support the conclusion that Plaintiff was not entirely credible.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI is supported by substantial evidence, and therefore recommends the Commissioner's decision be affirmed.


 s/James R. Knepp II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).

19